Filed 2/15/24  In re W.C. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.C.,<br><br>a Person Coming Under the Juvenile Court Law. | B329733<br><br>(Los Angeles County Super. Ct. No. 22CCJP00715) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>V.N. and W.C.,<br><br>      Defendants and Appellants. | ORDER MODIFYING OPINION AND DENYING REHEARING [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 16, 2024, be modified as follows:

1.     The first paragraph of Section B shall be modified to remove the sentence "We agree with DCFS."

2.     The first sentence of the second to last paragraph in Section B.2. previously stated "We find DCFS's inquiry as to father's family satisfied the

ICWA requirements." The opinion shall be modified so that this sentence now reads "We find DCFS's inquiry as to the paternal great-aunt Joyce satisfied the ICWA requirements."

3. The opinion shall be further modified to include a new paragraph immediately preceding the Disposition stating:

On November 13, 2023, father filed a motion to take additional evidence on appeal which we granted. This additional evidence consists of a declaration from father stating that he has learned of Indian ancestry in his family through his maternal grandfather, Geronimo C. Father attests that Geronimo C. was "full blooded Apache Chiricahua." This information was not known to DCFS until after the instant appeal had been filed and thus DCFS could not have investigated this potential avenue of Native American heritage below. However, we find that on remand, further inquiry as to the paternal great-grandfather, Geronimo C., is warranted. On remand, DCFS shall conduct a further inquiry of father's extended family as to Geronimo C., as well as with the Apache Chiricahua tribe.

4. The Disposition previously read as follows:

The order terminating parents' parental rights and denying their section 388 petitions is conditionally affirmed. The matter is remanded with instructions to DCFS and the juvenile court to conduct any necessary ICWA inquiry into mother's family as soon as practicable. This inquiry shall include compliance with ICWA's notice requirements. If the inquiry and notice do not reveal evidence of Native American heritage through mother's family, the order terminating parents' parental rights shall stand.

The opinion is to be modified so that the Disposition now reads as follows:

The order terminating parents' parental rights and denying their section 388 petitions is conditionally affirmed. The matter is remanded with instructions to DCFS and the juvenile court to conduct any necessary ICWA inquiry as soon as practicable. This inquiry shall include compliance with ICWA's notice requirements. If the inquiry and notice do not reveal evidence of Native American heritage, the order terminating parents' parental rights shall stand.

This modification changes the judgment.

The parties' petitions for rehearing are DENIED.

COLLINS, Acting P. J.      MORI, J.      ZUKIN, J.

3

Filed 1/16/24  In re W.C. CA2/4 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re W.C., <br><br> a Person Coming Under the Juvenile Court Law. | B329733 <br><br> (Los Angeles County Super. Ct. No. 22CCJP00715) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> V.N. and W.C., <br><br> Defendants and Appellants. | |

APPEAL from an order of the Superior Court of Los Angeles County, Tara Newman, Judge.  Affirmed in part and remanded in part.

Gino de Solenni, by appointment of the Court of Appeal, for Defendant and Appellant V.N.

Seth F. Gorman, by appointment of the Court of Appeal, for Defendant and Appellant W.C.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

**INTRODUCTION**

Mother and father appeal the juvenile court's orders denying their Welfare and Institutions Code section 388[1] petitions and terminating their parental rights under section 366.26. On appeal, both parents contend the Los Angeles County Department of Children and Family Services (DCFS) failed to comply with the inquiry requirements under the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.) and related California statutes (§ 224 et seq.). Mother also challenges the merits of the court's denial of her section 388 petition.

We conditionally affirm the court's order denying parents' section 388 petitions and terminating their parental rights. We remand the case for the limited purpose of ensuring compliance with ICWA.

As the parties are familiar with the facts and procedural history of the case, we do not restate those details in full here. Below, we discuss only the facts and history as needed to resolve—and provide context for—the issues presented on appeal.

**DISCUSSION**

A. *Mother's Section 388 Petition*

The minor child, W.C., was born in February 2022. DCFS received a referral shortly after he was born, alleging he was the victim of neglect by his

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

mother, V.N. (mother). While in the hospital for prenatal care, mother had twice tested positive for amphetamines and methamphetamines in the two weeks leading up to W.C.'s birth. Each time, mother had left the hospital against medical advice.

Mother initially claimed she had previously used methamphetamines but had been off drugs for over a year before W.C.'s birth. Mother, who was 31 years old at the time, later admitted she had been using methamphetamines since she was 15 years old. Mother said she had completed a substance abuse program in 2019 and remained sober until 2021 when she lost her job and began using methamphetamines again. Mother also admitted to a history of criminal convictions related to drug use.

The day after W.C. was discharged from the hospital, the juvenile court granted a removal order and W.C. was detained and placed in the home of paternal aunt Michele R. and her husband. W.C. has remained in their care ever since.

On February 25, 2022, DCFS filed a section 300 petition alleging, among other things, that W.C. was at risk from parents' drug use. On April 25, 2022, the juvenile court adjudicated the section 300 petition, sustaining the counts concerning parents' drug use. The court ordered W.C. removed from parental custody and ordered DCFS to provide family reunification services to mother and father, Walter C. (father). Mother and father failed to comply with the case plan ordered by the court. Between March 2022 and February 2023, parents' contact and visits with the child were inconsistent. The parents would often cancel or fail to appear for scheduled visits. When they did appear, the parents arrived late or terminated visits early. On one occasion in July 2022, mother and father were arrested by law enforcement during a visit at a park. During the arrest, mother "was found in possession

of drug paraphernalia and methamphetamine" and was booked and issued a citation for possession of drug paraphernalia. For the remainder of 2022 following this arrest, mother only visited W.C. once. In a subsequent report, DCFS noted "the parents' inconsistency has affected the child in that he is no longer familiar with the parents due to the lack of contact with them."

On October 24, 2022, the court terminated reunification services for the parents and set the matter for a section 366.26 hearing to select and implement a permanent placement plan for the child.

On May 16, 2023, the day before the section 366.26 hearing, mother filed a section 388 petition. In her petition, mother requested "that her son be returned to her care and custody, with family maintenance services, or in the alternative, that reunification services be reinstated with orders for unmonitored visits." Mother claimed the requested change would be in the best interest of W.C. because "Mother has changed her life. She is participating in an aftercare program and complying with the previously ordered case plan in the hopes that her son one day be returned to her. The order would be better for [W.C.] because it would allow him to reunify with his mother, strengthening their parent/child bond and reestablish their family unit."

Attached to the petition were six unauthenticated exhibits. Exhibit 1 was an April 20, 2023, letter to mother's attorney indicating mother had entered treatment at La Casita Residential Treatment Program on February 15, 2023, and would be completing the residential portion of her treatment on April 25, 2023. The letter also states mother was participating in individual and group therapy sessions and had tested negative for illicit substances in weekly tests while in the program.

4

Exhibit 2 was a September 15, 2022, letter to mother stating mother began taking parenting classes on July 25, 2022, at Helpline Youth Counseling. The letter states mother "participated in 5 out of the 10 parenting sessions" and "was an active participant in the classes she did attend."

Exhibit 3 appears to be a screenshot of an undated email message stating mother had enrolled for services at Rio Hondo Mental Health and had an appointment with a case worker set for March 21, 2023, and an appointment with a therapist set for April 6, 2023.

Exhibit 4 is an undated and unsigned letter purporting to be from mother's Alcoholics Anonymous sponsor which states "I have known [mother] for a couple months now and I am sponsoring her. She calls regularly and has been doing the work. I see her willingness to change her life choices."

Exhibit 5 is a photograph of a portion of an undated letter stating on May 9, 2023, mother had enrolled in the Intensive Outpatient Treatment Program of the Los Angeles Centers for Alcohol and Drug Abuse (L.A. CADA) program. The letter states mother was to attend six group therapy sessions per week and submit to random testing once a week. It also states mother was "working toward continued sobriety and has entered one of L.A. CADA Recovery Bridge Housing called Grace's Place."

Exhibit 6 consists of two photocopied pages and one photograph of a piece of paper purporting to collectively be a log of mother's visits and phone calls with W.C. from March 11, 2023, to May 15, 2023.

Mother's petition was heard on May 17, 2023. At the hearing counsel for DCFS objected to the admission of the exhibits attached to mother's petition on the basis that they had only been received the previous day and had not been authenticated. The court admitted mother's exhibits but stated

they would be given their "due weight" considering they had not been authenticated. Counsel for W.C. and counsel for DCFS both opposed mother's petition.

The court denied the petition. The court explained that the letter regarding mother's parenting classes was dated before the termination of reunification services and was thus not new information that could warrant a change of the order terminating reunification. The court also noted that while mother had enrolled in mental health services that were to start two months prior, the court had "no further information as to whether or not that actually did begin." The court noted that while the letter from mother's sponsor was encouraging, it was not dated and there was "limited information with regard to the authenticity." While the visitation logs showed mother had been spending time with W.C., the court noted "[T]his is a very recent development" and the reports also indicated "there are months without visits with the minor."

Ultimately the court found mother had not met the burden to set her section 388 petition for a full hearing, holding "The circumstances demonstrated are changing but not changed. Mother is making good progress, but at this point in the case, it is not sufficient to demonstrate changed circumstances. Given the minor's age, the parents' inconsistent visits and periods of not visiting at all, I find it is not in the minor's best interest to set the mother's 388 [petition] for a full evidentiary hearing and the 388 [petition] is denied."[2]

---

[2] Father also filed a section 388 petition which was summarily denied by the juvenile court. On appeal, father does not challenge the denial of his petition on its merits and instead only attacks the sufficiency of DCFS's inquiry under ICWA.

The juvenile court then conducted the section 366.26 hearing, ultimately terminating parental rights for mother and father. Mother and father timely appealed.

1. *Legal Standards*

Section 388 allows a parent to petition to change, modify, or set aside any previous juvenile court order. (§ 388, subd. (a).) "To obtain an evidentiary hearing on a section 388 petition, a parent must make a prima facie showing that circumstances have changed since the prior court order, and that the proposed change will be in the best interests of the child. [Citations.]" (*In re Alayah J.* (2017) 9 Cal.App.5th 469, 478.) The parent petitioning under section 388 has the burden of establishing both prongs by a preponderance of the evidence. (*In re J.M.* (2020) 50 Cal.App.5th 833, 845.)

"To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.) A petition that only shows changing—not changed—circumstances is insufficient to require an evidentiary hearing. (*Ibid.*; *In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 610.) The petition should also explain "'the reason the change was not made before.'" (*In re D.R.* (2011) 193 Cal.App.4th 1494, 1512.) The fact that the parent "makes relatively last-minute (albeit genuine) changes" does not automatically tip the scale in the parent's favor. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530 (*Kimberly F.*).)

"It is not enough for a parent to show *just* a genuine change of circumstances under the statute. The parent must show that the undoing of the prior order would be in the best interests of the child. [Citation.]" (*Kimberly F., supra,* 56 Cal.App.4th at p. 529.) "When custody continues over a significant period, the child's need for continuity and stability assumes an

7

increasingly important role." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 464 (*Angel B*).) "After the termination of reunification services, a parent's interest in the care, custody and companionship of the child is no longer paramount. [Citation.] Rather, at this point, the focus shifts to the needs of the child for permanency and stability." (*Ibid.*) "While the bond to the caretaker cannot be dispositive . . . , our Supreme Court made it very clear in *Jasmon O.* that the disruption of an existing psychological bond between dependent children and their *caretakers* is an extremely important factor bearing on any section 388 motion." (*Kimberly F.*, *supra*, 56 Cal.App.4th at p. 531, citing *In re Jasmon O.* (1994) 8 Cal.4th 398, 408, 414–422.) For a parent "to revive the reunification issue," the parent must prove that circumstances have changed such that reunification is in the child's best interest. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)

"In determining whether [a § 388] petition makes the required showing, the court may consider the entire factual and procedural history of the case." (*In re K.L.* (2016) 248 Cal.App.4th 52, 62.) A section 388 petition may not be based on a parent's conclusory assertions. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

"We normally review the grant or denial of a section 388 petition for an abuse of discretion." (*In re Alayah J.*, *supra*, 9 Cal.App.5th at p. 478.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd. The appropriate test is whether the court exceeded the bounds of reason." (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)

2.    *The Trial Court Did Not Abuse its Discretion in Summarily Denying Mother's Section 388 Petition*

*Angel B.* is squarely on point.  In that case, mother admitted to using cocaine and amphetamines while pregnant.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 459.)  The infant child, Angel, was detained while in the hospital and promptly placed in foster care with a potential adoptive family.  (*Ibid*.)  Mother had a long history of drug abuse dating back to the age of 13.  (*Ibid*.)  Mother had previously attempted rehabilitation for her substance abuse issues "without permanent success."  (*Ibid*.)

The mother was granted monitored visitation with Angel, but only appeared for some of the scheduled visits and missed several court hearings.  (*Angel B.*, 97 Cal.App.4th at p. 459.)  After the court determined mother was not to receive any reunification services, mother began to do better.  "She enrolled in a residential drug treatment program, consistently tested clean for four months, completed various classes, and even obtained employment."  (*Ibid*.)  She also had regular visits with Angel.  (*Ibid*.)  She then filed a petition under section 388 seeking either supervised custody of Angel or reunification services.  (*Ibid*.)  Her petition included a declaration and letter from mother, a letter from a family friend who had supervised mother's visits with Angel, and a letter from the residential drug rehabilitation program in which mother was enrolled.  (*Id*. at p. 461.)  The juvenile court summarily denied her section 388 petition without holding a hearing.  (*Id* at p. 459.)  The Court of Appeal affirmed.

The appellate court noted mother "had consistently tested clean for drugs and alcohol" while in the rehabilitation program and had completed parenting classes.  (*Angel B.*, *supra*, 97 Cal.App.4th at p. 461.)  Mother was also successfully participating in individual counseling and had been

9

consistently visiting and bonding with Angel. (*Ibid*.) However, the court found that, while mother "had completed the drug program, the time she had been sober was very brief compared to her many years of drug addiction." (*Id*. at p. 463.) Ultimately, the court determined mother had not shown modification would have been in Angel's best interest. The court noted mother "never actually parented Angel before her removal, and Angel was immediately placed with an adoptive family." (*Id*. at p. 465.) Instead, the adoptive family "provided Angel with all the day-to-day, hour-by-hour care needed by a helpless infant and then growing toddler." (*Ibid*.) By comparison, mother's visits "add[ed] up to only a tiny fraction of the time Angel has spent with the foster parents." (*Ibid*.)

The court recognized that mother was "doing well, in the sense that she has remained sober, completed various classes, obtained employment, and visited regularly with Angel." (*Angel B.*, *supra*, 97 Cal.App.4th at pp. 464–465.) However, it held "such facts are not legally sufficient to require a hearing on her section 388 petition" even if the court were to assume "that this time her resolve *is* different, and that she will, in fact, be able to remain sober." (*Id*. at p. 465.) Other courts are in accord with the holding in *Angel B*. (See, e.g., *In re Jamika W.* (1997) 54 Cal.App.4th 1446 [participation in a recovery program and clean drug tests did not satisfy burden under § 388 where mother had very little contact with the child, who was doing well and bonded to the guardian]; *In re Anthony W., supra,* 87 Cal.App.4th at p. 252 [mother's participation in drug counseling and parenting classes was insufficient to show "it would be the children's best interest to continue reunification services, to remove them from their comfortable and secure placement to live with mother who has a long history of drug addiction"]; *In*

10

*re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 [seven months of sobriety since relapse, while commendable, did not satisfy father's burden under § 388].)

The same result follows here. Mother's recent interest in parenting W.C. is laudable but falls short of requiring an evidentiary hearing on her section 388 petition.

Mother presented evidence that she had begun changing her circumstances, not that they had fully changed. The unauthenticated exhibits attached to her petition showed she had started a residential treatment program and enrolled in mental health services. However, it did not show that she completed the program or actually participated in any mental health services. It also showed she only attended half of the parenting classes offered by Helpline Youth Counseling. This evidence—even when coupled with three months of clean drug testing and regular visits with W.C.—shows she was at the early stages of her recovery. We note this is not the first time mother has entered a treatment program. She previously completed a drug treatment program in 2019, only to relapse and resume using drugs in 2021. That mother remained sober in the three months leading up to her petition is praiseworthy but does not establish that her long history of drug addiction can now be considered fully resolved. As the trial court found, her circumstances were in the process of changing but had not yet changed. This alone establishes the trial court did not abuse its discretion in denying her petition without an evidentiary hearing.

Mother also made no real showing that the proposed change would be in W.C.'s best interest. She argues reunification would be in W.C.'s best interest because it would reunify him with his mother. This is true of any section 388 petition seeking reunification with a child. Mother cites no authority that the reunification of a parent and child is automatically deemed

11

to be in the child's best interest.  Indeed, this argument misapprehends the focus of the court's inquiry in determining the child's best interest at this stage of proceedings.  As set forth above, after the termination of reunification services, the child's needs for stability and permanency take center stage above the parent's interest in reunification.  As with the child in *Angel B.*, W.C. has been residing with the guardian effectively from birth. Mother has not shown that the delay of W.C.'s placement in a permanent and stable environment while mother continues to work on her self-improvement would serve his best interests.  (See *In re Jackson W.* (2010) 184 Cal.App.4th 247, 260 ["The petition made no showing of how the minors' best interests would be served by depriving them of a permanent, stable home in exchange for an uncertain future"].)

On this record, we find the juvenile court did not abuse its discretion in summarily denying her section 388 petition without an evidentiary hearing.

B. *ICWA Compliance*

Mother and father contend DCFS and the juvenile court failed to inquire of extended family members as to whether W.C. is an Indian[3] child under ICWA.  DCFS concedes that it did not sufficiently inquire as to mother's family but argues its inquiry as to father's family was sufficient. We agree with DCFS.

Congress enacted ICWA "to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian

---

[3]    "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many."  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

children from their families and placement of such children 'in foster or adoptive homes which will reflect the unique values of Indian culture.'" (*In re Levi U.* (2000) 78 Cal.App.4th 191, 195; see also 25 U.S.C. § 1902.) "ICWA recognizes that "'the tribe has an interest in the child which is distinct from . . . the interest of the parents.'"'" (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253.) Under state law, the juvenile court and DCFS have "an affirmative and continuing duty to inquire whether a child for whom a petition under Section 300 . . . may be or has been filed, is or may be an Indian child."[4] (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9, 11–12.) "The continuing duty to inquire whether a child is or may be an Indian child 'can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice.'" (*In re Y.W.* (2021) 70 Cal.App.5th 542, 552.)

The duty of initial inquiry includes, but is not limited to, "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b).) "Extended family members" include persons defined by law or custom of the Indian child's tribe, or in the absence of law or custom, adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c); 25 U.S.C. § 1903(2).)

---

[4] An "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (§ 224.1, subds. (a), (b); 25 U.S.C. § 1903(4).)

13

1.    *Maternal Family ICWA Inquiry*

Mother initially denied any Native American ancestry. In April 2022, DCFS contacted two maternal great-aunts, both of whom indicated mother did not have any Native American ancestry. Several months later, mother told DCFS that she believed she had Cherokee ancestry through her maternal grandfather. Mother said she did not know if anyone had registered with a tribe. DCFS contacted both maternal great-aunts again to attempt to corroborate mother's claim of Cherokee ancestry. One great-aunt again denied Native American ancestry, and the other, Yvonne C., claimed ancestry through mother's maternal grandfather, stating "We do [have Native American ancestry] from New Mexico, but since dad passed, we can't remember [the] name." Yvonne C. also stated she was not aware of anyone else DCFS could contact for additional information.

In January 2023, DCFS interviewed the maternal grandmother. She indicated that her father—the maternal great-grandfather—had Native American heritage with the Apache tribe. She indicated he had passed away in 2020 and was not enrolled with the tribe and did not have an enrollment number with any tribe. DCFS later attempted to contact maternal great-grandmother again to obtain additional information as to the identity of her father. DCFS left a voicemail for the maternal great-grandmother but did not receive a response.

Several months later, DCFS contacted maternal great-aunt Yvonne C. again. At this time, Yvonne C. claimed the family had ancestry "with the Apache and Mescal tribes from New Mexico," though she said no family members were registered with any tribe.[5] In an April 2023 status report,

---

[5]    This reference to the "Mescal" tribe was presumably meant to refer to the Mescalero Apache tribe.

14

DCFS indicated it was in the process of sending questionnaires to the maternal grandmother and great-aunt "to obtain a clearer picture of their family background."

The record before us does not indicate whether these questionnaires were ever sent, or whether DCFS made any further inquiry of potential Native American ancestry through any Cherokee or Apache tribes, including the Mescalero Apache tribe. DCFS concedes it erred in not making further inquiry into potential Native American ancestry through mother's family.

We agree further inquiry of mother's family was warranted here and conclude that DCFS's failure to adequately discharge its duty of initial inquiry can be addressed by a conditional affirmance of the juvenile court's orders with directions to require DCFS to fulfill its duty. (See *In re Baby Girl M.* (2022) 83 Cal.App.5th 635, 639, fn. 2 ["We see no need to order any ICWA findings vacated because ICWA-related obligations are continuing duties; that means earlier ICWA-related findings are subject to change and no order vacating an earlier finding is necessary here"]; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1018 [same].)

On remand, DCFS shall conduct a further inquiry of mother's extended family, as well as with the Cherokee and Apache tribes.

2.      *Paternal Family ICWA Inquiry*

Father initially denied any Native American ancestry. In April 2022, DCFS contacted two paternal aunts who both indicated father did not have any Native American ancestry. DCFS contacted both paternal aunts again in September 2022 to conduct a further ICWA inquiry. Paternal aunt Michele R. said she was unsure if father has any Native American ancestry. Paternal aunt Jessica R. told DCFS that the father's side of the family is of "mixed"

15

heritage and stated she was "not 100% [sure] what we are." Neither aunt was aware of any family members registered to a tribe.

DCFS also contacted a third paternal aunt, Peggy F., who indicated there "may" be Native American ancestry in the family, saying Michele R. did a DNA test and may have more information. When DCFS asked if there was anyone they could contact for more details, Peggy F. identified "aunt Joyce." Peggy F. attempted to contact Joyce by text message on behalf of DCFS but did not receive a response.

In a subsequent interview in March 2023, Michele R. stated she had no further updates and said the family did not have Native American heritage.

Father argues DCFS failed to comply with ICWA inquiry requirements in not making further efforts to contact paternal great-aunt Joyce. We disagree. Father mischaracterizes the record, claiming it shows that Joyce "was disclosed as likely having . . . information on [father's Native American] ancestry." No such statement appears in the record. Instead, the record indicates paternal aunt Peggy F. told DCFS that "maybe our aunt Joyce would know" about potential ancestry. Peggy F. did not state she believed there was ancestry in the family or that W.C. was likely to have Native American heritage, rather she said only that she thought W.C. "may" have such lineage.

We find DCFS's inquiry as to father's family satisfied the ICWA requirements. DCFS "must inquire as to possible Indian ancestry and act on any information it receives, but it has no duty to conduct an extensive independent investigation for information." (*In re C.Y.* (2012) 208 Cal.App.4th 34, 41; *In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1413 ["the obligation is only one of inquiry and not an absolute duty to ascertain or refute [Indian] ancestry"]; *In re Levi U., supra,* 78 Cal.App.4th at p. 199,

16

superseded by statute on other grounds as stated in *In re B.E.* (2020) 46 Cal.App.5th 932, 940 [DCFS is not required to conduct an extensive independent investigation or to "cast about" for investigative leads].) "While we believe it reasonable in many cases to require DCFS to follow up on leads provided by parents, we cannot ask the agency to intuit the names of unidentified family members or to interview individuals for whom no contact information has been provided." (*In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082.)

Here, DCFS made efforts to contact the paternal great-aunt Joyce regarding potential Native American ancestry and Joyce did not respond. This effort was made through relative Peggy F. The record before us on appeal does not suggest Peggy F., father, or any other family member ever provided DCFS with contact information for Joyce to conduct a further inquiry. DCFS was not required to make repeated attempts to contact the paternal great-aunt after she failed to respond to the initial inquiry.

//
//
//
//
//
//
//
//
//
//

17

**DISPOSITION**

The order terminating parents' parental rights and denying their section 388 petitions is conditionally affirmed. The matter is remanded with instructions to DCFS and the juvenile court to conduct any necessary ICWA inquiry into mother's family as soon as practicable. This inquiry shall include compliance with ICWA's notice requirements. If the inquiry and notice do not reveal evidence of Native American heritage through mother's family, the order terminating parents' parental rights shall stand.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ZUKIN, J.

WE CONCUR:


COLLINS, Acting P. J.


MORI, J.

18